# MISSOURI, O. & G. RY. CO. v. OVERMYRE.

Opinion Filed July 25, 1916.

Rehearing Denied November 21, 1916.

(160 Pac. 933.)

1. **MASTER AND SERVANT—Injuries to Servant—Actions—Pleading.** It being competent to show a general custom among others in the same business with regard to their places for work, or methods commonly used in connection therewith. as bearing on the question of the master's exercise of due care in providing reasonably safe instrumentalities or places with and in which to work, it was not error to refuse to strike from the petition an allegation charging such custom.

2. **SAME—Railroads—Sufficiency of Evidence.** Where it is shown that the switch tracks in the yards of a railroad company were located so closely together at a point in said yards as not to afford sufficient space to enable a hostler's helper, in the employ of said company, to properly discharge his duties, and whereby and while so engaged he was killed, the primary negligence of the company is sufficiently established.

3. **SAME—Admissibility of Evidence.** In an action brought by the administrator of the estate of a deceased railroad employee, on account of the death of such employee, brought about by the alleged negligence of the railroad company, it is competent to inquire into the manner of the construction and location of the tracks of the railroad company, though the inquiry involves an engineering question.

4. **SAME—Place to Work—Care Required.** It is the duty of a railroad company to so construct its tracks in its yards as will make them reasonably safe for its employees to perform their duties; and a party entering the service has the right to assume that this obligation has been discharged.

5. **SAME—Assumed Risks.** An employee is not considered as assuming such risks as are not naturally incident to the occupation, arising out of the failure of the employer to exercise due care with respect to providing a safe place to work and safe appliances for the work, until he becomes aware of the defect and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person, under the circumstances, would have observed and appreciated them.

6.    **SAME—Notice of Danger.** Notice of the danger and appreciation of the risk resulting from the act of the hostler in moving an engine of the larger class, such as shown by the evidence, past another engine of the same class at the time standing on the track over the cinder pit, cannot be imputed to the helper solely by reason of the fact that he was aware of the location of the switch tracks at said point, or because he may have been informed generally of the dangers of the service.

(Syllabus by the Court.)

*Error from Superior Court, Muskogee County;*
*Farrar L. McCain, Judge.*

Action by A. S. Overmyre, administrator of the estate of Guy E. Overmyre, against the Missouri, Oklahoma & Gulf Railway Company. Judgment for plaintiff, and defendant brings error. Affirmed.

*E. R. Jones* and *J. C. Wilhoit* (*Arthur Miller*, of counsel), for plaintiff in error.

*B. B. Blakeney* and *J. H. Maxey, Jr.*, for defendant in error.

SHARP, J. On March 19, 1912, Guy E. Overmyre, the deceased, aged 20 years, was in the employ of the Missouri, Oklahoma & Gulf Railway Company, as a hostler's helper, at the shops and in the yards of the defendant company at Muskogee. While in the discharge of his duties on said day, on the tender attached to engine 223, controlled by the hostler, F. M. Scott, and at a time when said engine and tender were being backed into the roundhouse, the said Overmyre was struck and killed by engine 219, at the time standing over the cinder pit on an adjoining track in the yards of said company. In an action to recover damages on account of the alleged negligent killing of said employee, his father, A. S. Overmyre, who was appointed administrator of the estate of his deceased son, recovered judgment in the sum of $5,000, to reverse which the present proceedings in error were instituted.

It is first urged that the court erred in overruling the defendant's motion to strike certain portions of plaintiff's petition charging:

"That successful and thorough engineering such as is in common, ordinary use by railroad companies on the lines of railroad in Oklahoma and elsewhere, requires that such tracks should be constructed allowing a space intervening of not less than seven and one-half feet between rails, so that the engines and cars placed on one track would not peril the safety and lives of operators of engines and cars upon the adjoining track, and that said custom was well known to said defendant and by it recognized in the construction of its other tracks at all other places and points on said line."

The principle objection to the allegation is that the location of the tracks of the company in its yard was an engineering question to be determined entirely by the railroad company through its management, and was not, therefore, a question to be submitted to a jury; and the further objection, that whether the yards of the defendant were a reasonably safe place in which to work was to be determined by the actual condition thereof, and not by comparing them with the tracks in the yards of other railroad companies. Neither objection, upon the record, is well taken. The first will be discussed later under another head.

It is competent to allege and prove a general custom among others in the same business respecting their places for work, or methods employed, on the question of the master's exercise of due care in providing reasonably safe places in which to work. *St. Louis & S. F. R. Co. v. Long,* 41 Okla. 177, 137 Pac. 1156, Ann. Cas. 1915C, 432. Concerning the competency of evidence of usage in such

circumstances, it is said in Labatt, Master and Servant (2nd Ed.) 939:

"It may be laid down as an undisputed proposition that, where the injury complained of was caused by an instrumentality or method which, at the time of the accident, was in its normal condition, evidence going to show that, such an instrumentality was or was not commonly used under similar circumstances by persons in the same line of business as the defendant is always competent for the purpose of proving that he was or was not in the exercise of due care in adopting or retaining that instrumentality as a part of his plant."

The same general rule is announced in 26 Cyc. 1431, 1433, 1434, and is supported by many authorities, including *Hennessey v. Bingham*, 125 Cal. 627, 58 Pac. 200; *Louisville, B. & I. Co. v. Hart*, 122 Ky. 731, 92 S. W. 951; *Holland, Adm'r, v. Tennessee, C. I. & Ry. Co.*, 91 Ala. 444, 8 South. 524, 12 L. R. A. 232; *Anderson v. Illinois Cent. R. Co.*, 109 Iowa, 524, 80 N. W. 561; *Myers v. Hudson Iron Co.*, 150 Mass. 130, 22 N. E. 631, 15 Am. St. Rep. 176. Of the rule it is said in Wigmore on Evidence, sec. 461:

"This conduct of others, then, (1) is receivable as some evidence of the nature of the thing in question, because it indicates what is the influence of the thing on the ordinary person, in that situation, but (2) it is not to be taken as fixing the legal standard for the conduct required by law."

It being competent to prove the common usage of other railroads respecting the location of their tracks in railroad yards, under like circumstances, as bearing on the question of the master's exercise of due care in providing reasonably safe places in which to work, it was proper that the issue be tendered by suitable averment in the petition.

The next three assignments of error may be considered together, as all involve the consideration of the contention that the location and construction of switch tracks in the railroad yards was an engineering question to be determined by the management of the railway company. It is claimed by the company in this respect:

"Our contention is that this situation did not disclose negligence; that the location of its tracks by the defendant railroad company was an engineering question to be determined by the management of the defendant company, and could not properly be left to a jury for determination; that in the location and construction of the tracks the defendant railroad company had the right to construct them as it saw fit, so as to better handle its business; and that negligence could not properly be predicated on the location of such tracks, and therefore the question of the location of such tracks could not properly be submitted to the jury."

For the purposes of the discussion, we may consider that the principal evidence of negligence lies in proof of the fact that on the roundhouse track adjoining the cinder pit engines of the size and kind used on the night in question would barely clear each other. There are authorities sustaining counsel's contention, the principal one of which is *Tuttle v. Detroit, G. H. & M. R. Co.*, 122 U. S. 189, 7 Sup. Ct. 1166, 30 L. Ed. 1114. In that case two of the justices dissented. Immunity on account of negligence in the location of railway tracks is denied in other jurisdictions. In *Gordon v. Chicago, etc., Ry. Co.*, 129 Iowa, 747, 106 N. W. 177, counsel made very much the same defense that is now before us. It was there charged that the defendant's road was negligently constructed and maintained, with a sharp depression in the track, and that freight trains in passing over this depression were liable to become uncoupled. It was held that the court would

not give its approval to the proposition advanced that in actions such as the one before the court the construction of the road could not be questioned, or that "it will not do to allow juries to inquire into questions of this character." Referring to the opinion of the Supreme Court in the Tuttle Case, it was said:

"In that case the majority opinion contains a few sentences which, standing alone, would appear to be in harmony with appellee's view of the law, but a reading of the entire opinion discloses that the employee who was there seeking a recovery of damages had entered into and remained in the company's service with full knowledge of the defective track on and about which he worked, and was therefore held to have assumed the risk of injury therefrom. Such being the case, the language quoted by appellee herein may be considered *dictum*."

After referring to the general rule that the master owes to the employee the duty of furnishing a reasonably safe place to work, and observing that said rule applies to railroads, it was said concerning the question before us, in *Phalan v. Detroit, G. H. & M. R. Co.,* 122 Mich. 232, 81 N. W. 103:

"It is urged that a railroad company has a right to construct its road and structures after plans of its own, and not subject to the approval of juries, who cannot be allowed to determine such questions. This is equivalent to saying that the doctrine that a master must furnish a reasonably safe place for his employee to work does not apply to railroads. We appreciate the practical consequences of leaving such a question to a jury, and the proneness of such tribunals to accept the fact of an accident as sufficient evidence of fault upon the part of the master. We should hardly like to admit that lawyers and juries know more about proper railroad building than those experienced therein. But, on the other hand, we cannot say that railroads are free from defects, or the

owners and their employees from negligence; nor is there authority or reason for exempting them from the general law pertaining to master and servant."

In *Baltimore & O. S. W. R. Co. v. Roberts,* 161 Ind. 1, 67 N. E. 530, the facts were very much the same as in the case at bar, and it was held, in an action by a freight brakeman for personal injuries, caused by the alleged negligence of defendant in maintaining its tracks in such close proximity to each other, and in leaving a car loaded with lumber standing on one of its tracks, which struck plaintiff as he passed on a car, in the line of his duty, that the negligence of the railroad company was properly submitted to the jury. In *Voorhees v. Lake Shore & M. S. R. Co.,* 193 Pa. 115, 44 Atl. 335, there were five tracks at the place where the accident occurred, two main tracks, two main sidings, and an extra siding or spur, known as the Porter siding. The regulation distance between the tracks of the railway company was from seven feet to seven feet two inches, but the Porter siding was so constructed as to leave only from five feet six inches to six feet between it and the south main siding. The space thus left between the south rail on the south main siding and the north rail of the Porter siding was alleged to be insufficient to enable a brakeman of a freight train on the former to safely discharge his duties when cars were on the Porter siding. While descending on the ladder from the top of the cars, and while at the side of one of them, the brakeman was struck and injured by coming in contact with a car standing on the Porter siding. In the opinion it was held that the evidence before the jury clearly tended to prove the faulty construction of the Porter siding; reference to it being made as the "dangerous man trap that was thereby set for brakemen and other employees of the company."

In *Mulvaney v. Brooklyn City R. Co.*, 1 Misc. Rep. 425, 21 N. Y. Supp. 427, affirmed in 142 N. Y. 651, 37 N. E. 568, the plaintiff, a brakeman on one of the defendant's trains, while forcing an intoxicated passenger to get off the side track and into the car, was knocked off and injured by a train moving in an opposite direction. It appeared that the track was improperly laid, being too close for trains to pass safely; that the outer rail was not raised, and that the curve was made of straight instead of curved rails; that it was not safe for trains to pass each other on the curve. There were no rules that trains should not pass each other on the curve, or, if they did, that they should slacken speed, or that all persons must keep off the steps while rounding the curve. It was held that the facts unexplained warranted the jury in finding the railroad guilty of negligence. In *Mohr v. Lehigh Valley R. Co.*, 55 App. Div. 176, 66 N. Y. Supp. 899, the trial court was sustained in submitting to the jury whether the defendant was negligent in the laying of its tracks. In *True v. Niagara Gorge R. Co.*, 70 App. Div. 383, 75 N. Y. Supp. 216, affirmed in 175 N. Y. 487, 67 N. E. 1090, a trolley car company's negligence was held to have been established by proof that, without cause, it constructed its double tracks so that for a few feet they were so close, that when cars passed at that point a conductor standing on the running board of one, as was necessary to collect fares, would be struck by the other, and that the conductor was not warned thereof. In Thompson on Negligence, sec. 4269, it is held to be the duty of a railway company towards its employees to so construct its tracks that they shall be reasonably safe, and that said duty is violated where the tracks are so near together that an employee engaged in his duties on the side of the car is liable to be brought into

contact with cars on the other track and killed or injured. The principle involved in the rule contended for is disapproved in Labatt on Master and Servant (2nd Ed.) sec. 932b, where it is said that, while the argument is plausible, it is scarcely satisfactory.

Counsel for plaintiff in error rely largely upon *Phoenix Printing Co. v. Durham,* 32 Okla. 575, 122 Pac. 708, 38 L. R. A. (N. S.) 1191, as announcing a principle calling for a reversal of the judgment. The question determined in that case was that a master has some discretion concerning the kind of machinery which he will use; that he may use new or old machinery as he likes; he may use an old pattern or a new one, as he pleases, provided the machinery which he uses is sound and performs the work which it is designed to do. And mere proof that he is using machinery of a certain kind and that an accident happens in the use of it does not tend to show negligence, unless it is coupled with some evidence, not mere speculation, that it is not properly performing its functions. While some of the authorities cited support a conclusion in conflict with that which we have reached, and there are perhaps some rather broad expressions found in the opinion, at the same time the rule of law there announced in the syllabus is correct, and not in conflict with the views herein expressed. *Ft. Smith & W. R. Co. v. McCormick,* 25 Okla. 782, 108 Pac. 377.

It is a very general rule that the question of the negligence of a railroad in constructing or maintaining a permanent structure along its track so as to injure a person on a passing train is one of fact to be decided by the jury. Whether the railroad acts from necessity in erecting a certain form of structure, or whether it is negligence to use it, is in such cases for the jury to decide.

Cases announcing this rule are very numerous. Many of them will be found in a note to *Chicago, M. & St. P. Ry. Co. v. Riley,* 145 Fed. 137, 76 C. C. A. 107, 7 Ann. Cas. 327; and in chapter 2 of Bailey, Personal Injuries (2nd Ed.), upon the subject of a safe place to work. The principle involved is thus stated in *St. Louis, F. S. & W. R. Co. v. Irwin,* 37 Kan. 701, 16 Pac. 146, 1 Am. St. Rep. 266:

"It was the duty of the railroad company to use ordinary care in providing tracks and bridges that would be reasonably safe for its employees in discharging the duties they were called on to perform. Brakemen and conductors of freight trains are frequently required to be on top of the cars both night and day. The hazards of such positions are great, and the duty of the company required that its employees should not be subjected to unnecessary perils from structures over and along the track which, by proper diligence on the part of the company, might be changed or removed. The necessity for a contrivance as dangerous as the overhead structure of this bridge was is not apparent. Indeed, it seems to have been otherwise planned, but was botched in the construction."

The court ruled that it was the duty of the railway company to construct and maintain its roadway and overhead structures in such a condition that an employee could perform all the duties required of him with reasonable safety.

In *Union Pacific R. Co. v. O'Brien,* 161 U. S. 451, 16 Sup. Ct. 618, 40 L. Ed. 766, it was held that a railroad company owes to its trainmen the duty to exercise the care which the exigencies reasonably demand, in furnishing proper roadbed, track, and other structures, including culverts for the escape of water collected and accumulated by its embankments and excavations. In *Choctaw, O. & G. R. Co. v. McDade,* 191 U. S. 64, 24 Sup. Ct. 24,

48 L. Ed. 96, the railroad company was held to be negligent as a matter of law for maintaining an iron spout so attached to a water tank as to be a constant menace to the lives and limbs of the brakemen on its trains, where it might readily have been so constructed and hung as to be safe. The car upon which McDade was engaged at the time of the injury was a furniture car, wider and higher than the average car, and of such size as to make it highly dangerous to be on top of it at the place it was necessary to be when giving signals, in view of the fact that the spout cleared the car by less than the height of a man above the car when in a position to perform the duties required of him. *In Texas & P. R. Co. v. Swearingen,* 196 U. S. 51, 25 Sup. Ct. 164, 49 L. Ed. 382, it was held that a railway company could not be said, as a matter of law, to have performed its duty to use due care to provide a reasonably safe place for the use of switchmen in its employ, when it had located scales where the tracks were only the standard distance apart, leaving a space of less than two feet for the movements of a switchman between the side of a freight car and the scale box, when incumbered with a lantern employed for signal purposes, especially if the necessity of the situation did not require the scales to be constructed in that way. In the opinion it is said:

"It was therefore properly a question for the determination of the jury whether or not the scales were maintained in a reasonably safe place, and, if not, whether the plaintiff had notice thereof. The Court of Appeals was of opinion, and rightly, we think, that the dangerous contiguity of the scale box to track No. 2, and the extra hazard to switchmen resulting therefrom, was not so open and obvious on other than a close inspection as to justify taking from the jury the determination of the question whether there had been an assumption of the risk."

The general principle involved in the Tuttle Case was present in the latter cases, and while the earlier opinion is not referred to nor expressly overruled, it was at least not followed.

Rejecting, as we do, the rule that the question of the location of the switch tracks, being an engineering question, could not properly be submitted to a jury, it is unnecessary to consider at any length the evidence tending to show the faulty location of the tracks at the place of the accident. In the brief of counsel for plaintiff in error, in respect to the location of tracks at the cinder pit, it is said:

"It would appear from an examination of the evidence offered by the plaintiff below that the plaintiff established one and only one condition upon which he predicated negligence, and that condition was that the cinder pit and roundhouse tracks of the defendant railway company were constructed so close together that an engine standing on the cinder pit track would not clear a man clinging on the inner side of an engine passing on the roundhouse track, which was adjacent thereto."

But the evidence goes even further than the candid admission of counsel. Engines passing along the roundhouse track, it seems, could safely pass other engines at the east end of the cinder pit stub, at a point beyond the cinder pit. Opposite the cinder pit the space between the cinder pit track and the roundhouse track was considerably narrower than at other places. Engines of the smaller type, it further appears, could safely pass other engines of like make while standing over the cinder pit, but this was not true of engines of the 200 class. E. G. Bowman, an employee of the railway company, present at the time of the accident, testified in this connection:

"Q. Now, Mr. Bowman, if you have ever seen the big engines sitting on the cinder pit track there, when an engine and cars attempted to pass on the roundhouse track—have you ever? A. Yes, sir. Q. What would happen? A. Well, as a general rule, they would take the engines all off the cinder pit track and take the cars by. Q. Well, did you ever see one when it attempted to pass on there with one on there? A. Yes, sir. Q. What happened? A. Well, if it is a small engine on the cinder pit track, it generally went by, but one of those large engines would hardly ever; they hardly ever taken them by any cars or anything. Q. Then you cannot say that you ever saw an engine attempting to pass, a large engine, on the cinder pit track? A. No, sir; I cannot. Q. You know, these coaches you say you tended to, did you ever notice any scars on them because of them attempting to pass the cinder pit? A. Yes, sir. Q. What kind of scars? A. It would be from a contact against the grubbing iron and things like that. Q. You say the general rule was they take off an engine before they attempted to pass. A. Yes, sir. Q. When the engine was moved back here on the bumper (indicating) on the cinder pit track, state whether it could be cleared then. A. Yes, sir. They have cleared them past or passed them there, but I have never seen one pass there."

O. D. Gordon, another employee of the defendant at the time of the accident, being asked in reference to the engines passing opposite the cinder pit on the roundhouse track, testified that the smaller class of engines would; and, being asked with reference to the larger engines, his testimony was:

"Q. The larger class, what will they do? A. The larger class engines—what track did you refer to this engine being on? Q. An engine on the cinder pit track trying to pass an engine on the roundhouse track? A. They will pass. Q. Where would the engine on the cinder pit track have to be located? A. It will have to be clear

back. Q. Clear back to this bumper? A. Yes; this end here; the bumper is over here. They have to put it back there to pass. Q. Did you ever see an attempt made to pass when it was situated over the cinder pit? A. Well, I have saw it until a lot of them got used to it around there. Q. What resulted when it was attempted to do that? A. They hung up their pilot beams occasionally. Q. They hung up their pilot beams occasionally? A. Yes, sir. Q. Anything else? A. And got a grubbing iron once in a while. Q. Tore off the grubbing irons, you mean? A. Yes; I mean the grubbing iron on the tender, not on the engine. Q. You went to work there some three years ago? A. Yes, sir. Q. I will ask you to state if, during the first year you worked there, that these grubbing irons struck as you say, that any time that ever occurred during that year? A. No, sir. Q. When did it occur? A. After it got the larger class of engines, the middle class will pass."

The witness further testified that the railway company used different classes of engines, numbered 40, 50, 60, 100, and 200. The No. 40 was a small engine, while the No. 200 was of a larger class. The smaller engines were first in use by the railroad company when, as we understand, the tracks were laid out; the larger engines, or those of the 200 class, having been put in use during the period of witness' employment by the company. J. A. Robertson, the roundhouse foreman, a witness for defendant, and who saw the accident, testified:

"Q. You had your attention directed toward the beam, the pilot beam? A. Yes, sir. Q. That was the—that was one of the widest parts of the engine? A. Yes, sir; this is the widest. Q. It is the widest part of the engine? A. Yes, sir. Q. It extended out further than any other part? A. Yes, sir. Q. You assumed, if it passed the rest of it would? A. Yes, sir; that was my idea in watching it. Q. And therefore did not look out to see what Guy was doing?

A. No, sir. Q. And you assumed if it passed the other part would, too? A. Yes, sir. Q. Where did it hit? A. It hit what we call the sill on the end of the tank. Q. What is that? A. The big heavy beam that the draw head bolts into."

The foregoing and other evidence conclusively establishes the faulty location of the switches at the place where the accident occurred, or of their use by the larger class of engines. While, perhaps, with reference to the smaller engines, the tracks were sufficiently wide apart to permit their safe operation, yet, as to the engines of the larger class, which protruded out over the rails for a greater distance, manifestly the tracks were improperly located, not only in respect to the safety of the company's employees, but of the engines and cars of the company as well. The issue of negligence in the location of its tracks was submitted to the jury in four separate instructions, prepared by and given at the company's request. These instructions we have examined, and find that three of them were most liberal in the company's behalf; in fact, it will be doubted that said instructions should have been given.

The giving of instruction No. 5 did not constitute error. The argument made against it is that, as it was the master's positive right to carry on its business in its own way, the manner of the location of its tracks was not a question that could be submitted to the jury. This contention we have already considered. The objection to that part of the instruction referring to the risk assumed by a servant entering the service of a master is not well taken. Among the duties enjoined upon the master is that he is bound to exercise reasonable care and diligence to provide his servant with a reasonably safe place in which to work. *Chicago, R. I. & P. Ry. Co. v. Wright*, 39 Okla.

58—24

84, 134 Pac. 427, and cases cited. While a person entering voluntarily into a contract of service assumes all the risks and hazards ordinarily incident to the employment, and such as are liable to arise from defects which are patent and obvious to a person of his experience and understanding, he does not, generally speaking, assume risks arising out of the negligence of the master. The servant assumes all the ordinary risks of the employment which are known to him, and which could have been known with the exercise of ordinary care to a person of reasonable prudence and diligence under like circumstances. Risks not naturally incident to the occupation, but which may arise out of the failure of the employer to exercise due care with respect to providing a safe place to work and safe appliances for the work, the employee is not considered as assuming until he becomes aware of their defect or improper construction, and of the risk arising from it, unless defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them. *Schlemmer v. Buffalo, R. & P. R. Co.*, 220 U. S. 590, 596, 31 Sup. Ct. 561, 55 L. Ed. 596, 600; *Texas & P. R. Co. v. Harvey*, 228 U. S. 319, 321, 33 Sup. Ct. 518, 57 L. Ed. 852, 855; *Gila Valley, G. & N. Ry. Co. v. Hall*, 232 U. S. 94, 102, 34 Sup. Ct. 229, 58 L. Ed. 521, 524; *Seaboard Air Line R. Co. v. Horton*, 233 U. S. 492, 34 Sup. Ct. 635, 58 L. Ed. 1063, 1070, L. R. A. 1915C, 1 Ann. Cas. 1915B, 475; *Chesapeake & O. R. Co. v. De Atley*, 214 U. S. 310, 36 Sup. Ct. 564, 60 L. Ed. 1016. The master's negligence of which the servant is ignorant, or not properly chargeable, is a risk not assumed by the latter. *Coalgate v. Hurst*, 25 Okla. 588, 107 Pac. 657; *Chicago, R. I. & P. Ry. Co. v. Duran*, 38 Okla. 719, 134 Pac. 876; *Dewey Portland Cement Co. v. Blunt*, 38 Okla. 182, 132 Pac. 659; *Chicago,*

*R. I. & P. Ry. Co. v. Wright, supra.* Whether the risk was
an ordinary risk of the employment, or whether an ex-
traordinary risk, known to and appreciated by the de-
ceased, or with knowledge of which he was properly
chargeable, was a question of fact to be left to and de-
termined by the jury. Primary negligence being shown,
the question of assumed risk was properly in issue. *St.
Louis & S. F. R. Co. v. Long,* 41 Okla. 177, 137 Pac.
1156, Ann. Cas. 1915C, 432. At the time of his death the
deceased had been employed as a helper to the hostler for
about 30 days. His experience in that capacity was there-
fore limited. While there is evidence tending to show that
he had been warned by fellow servants of the dangers of
the employment, whether or not at the time of the acci-
dent he had been informed of and warned against the par-
ticular danger that resulted in his death, or whether he
knew or should have known of and appreciated the danger
arising out of the use of the larger class of engines at the
place of the accident, was for the jury to decide. The
defense of assumption of risk being made, by section 6,
art. 23, Constitution, a question of fact, to be left to the
jury, and there being evidence properly warranting its
submission, the verdict of the jury thereon is conclusive.
*Muskogee Vitrified Brick Co. v. Napier,* 34 Okla. 618, 126
Pac. 792; *Chicago, R. I. & P. Ry. Co. v. Hill,* 36 Okla. 540,
129 Pac. 14, 43 L. R. A. (N. S.) 622; *Frederick Cotton Oil
Co. v. Traver,* 36 Okla. 717, 129 Pac. 747; *Sulsberger &
Sons v. Castleberry,* 40 Okla. 613, 139 Pac. 837; *Frisco
Lbr. Co. v. Thomas,* 42 Okla. 670, 142 Pac. 310; *Osage
Coal & Min. Co. v. Sperra,* 42 Okla. 726, 142 Pac. 1040.

That the deceased had worked in the yards for some
30 days, and knew of the location of the switch tracks at
different points therein, including the point of accident, is

not proof that he knew of or appreciated the particular danger that resulted in his death. As was said in *St. Louis, Ft. S. & W. R. Co. v. Irwin, supra:*

"In this case the jury have said, and not without testimony, that Irwin had no knowledge or opportunity to know of the dangerous character of the bridge. It is true that he had run over the road and through the bridge daily for three months preceding the accident. He knew of the existence of the bridge, and that it was constructed with overhead timbers, but it does not necessarily follow that he was acquainted with the proximity of the braces to the top of the caboose or cars."

And further:

"The law, however, does not require that an employee shall know of all defects or obstructions that may exist on the road, or in the service in which he is engaged; and it cannot be said that the peril in this case was so obvious and patent that Irwin must have known it. He had a right to assume that the company had done its duty and placed its track in such a condition that he could perform his duties with reasonable safety. The fact that a portion of the bridge was sufficiently high to clear a man's head while standing on the top of the car, and other parts were not, made the bridge all the more deceptive and dangerous."

The fact that at all other points in the yard, except at the converging points of the switches, the tracks were sufficiently far apart to obviate danger, together with the fact that the smaller type of engines could pass with safety at the cinder pit, while the larger engines could not, was a proper matter for the jury to consider in determining the defense of assumed risk. The instruction told the jury, in effect, that if the plaintiff had knowledge of the defective location of the tracks and appreciated the danger to him of such location in the performance of his duty, in

such circumstances he assumed the risk. In this there was no error.

Five instructions on the question of assumed risk were given by the court at the request of the defendant. These instructions fairly and favorably submitted to the jury the defendant's theory of the case, and it is principally because the court refused to accept the defendant's claim of immunity that the objection is made. It may be admitted that the location of the side tracks was an engineering question. The fact that it was, however, does not place the railroad company beyond the reach of the law when negligence in the construction is shown.

The instruction in regard to discovered peril was properly given. No objection to its form or sufficiency is urged, but it is said there is no evidence authorizing its submission. The testimony of both the fireman and hostler was that they were aware of the danger to which Overmyre was exposed in the situation in which he was placed, as engine No. 223 was being backed toward the roundhouse past engine No. 219 on the cinder pit. It does not appear that either of said employees made any effort to warn Overmyre of the peril of his position, or prevent injuring him by stopping the engine, though it would seem that sufficient opportunity to do so was afforded. Knowledge on the part of Overmyre of the imminent danger to which he was exposed is to charge him, not of contributory negligence alone, but of suicidal purpose as well. Considering his limited experience in the capacity in which he was at the time employed, the variation in the width of the tracks at different points, the dissimilarity in the size of engines in use, the fact that engine 219 had been spotted on the cinder pit by other employees during his absence from the immediate part of the yards, the testimony

authorizing the conclusion that at the time his attention was wholly occupied in the performance of his duties, and the rules of the company forbidding the attempt to clear cars at the cinder pits, there is abundant ground for belief that the deceased did not know and appreciate his perilous situation. The instruction told the jury that if employees having control of the action of the deceased, and of the movement of the engine and tender on which he was riding, saw his dangerous position, and had knowledge of the location of the engine on the cinder pit track, and appreciated the danger in which the deceased was placed as the engine on which he was riding was being moved, and failed to warn him of his danger, when by the use of reasonable care warning could have been given, then on account of such failure said other employee would be guilty of negligence, and the plaintiff would be entitled to recover, even though the deceased was guilty of contributory negligence. The evidence fairly authorized the conclusion that, had the hostler and foreman, or either of them, exercised reasonable care and prudence on the occasion, the fatal consequences could have been avoided. The rule announced in the instruction has been followed in this jurisdiction in *Atchison, T. & S. F. Ry. Co. v. Baker,* 21 Okla. 51, 95 Pac. 433, 16 L. R. A. (N. S.) 825; *Clark v. St. Louis & S. F. R. Co.,* 24 Okla. 764, 108 Pac. 361; *Oklahoma City Ry. Co. v. Barkett,* 30 Okla. 28, 118 Pac. 350, and other cases. It is well established that, when a defendant charged with a duty to an employee, after having become aware of said employee's negligence, and the danger to which it has exposed him, fails to exercise ordinary care in avoiding it, such defendant is liable for the injury. Whittaker's Smith on Negligence, p. 375; Wharton on Negligence, secs. 334, 335; *Inland & Sea*

*Board Coasting Co. v. Tolson,* 139 U. S. 551, 11 Sup. Ct. 653, 35 L. Ed. 270.

Instruction No. 7, when considered in connection with the other instructions, fairly submitted to the jury the law making it the duty of the railroad company to warn its employees concerning the danger of the service in which they are engaged.

Nor was there error in refusing to give defendant's requested instruction No. 28, on the question of contributory negligence. This defense was submitted to the jury fully and favorably in five instructions requested by the defendant.

From what has been said we are constrained to hold that defendant company was given every legal consideration in the trial to which of right it was entitled. It requested the giving of 36 instructions covering its theory of the case, 28 of which were given. The primary negligence of the railroad company was fully established by the evidence. Its defenses of contributory negligence and assumed risk were fairly submitted and found not sufficient to relieve it of liability.

The proximate cause of the death of young Overmyre being the negligence of the company, it follows that the judgment of the trial court should be, and is, affirmed.

All the Justices concur.